575 F.2d 1178
 James RANDOLPH, Petitioner-Appellee,
v.
Harry PARKER, Chief, Respondent-Appellant.
Wilburn PICKENS, Petitioner-Appellee,
v.
Harry PARKER, Chief, Respondent-Appellant.
Isaiah HAMILTON, Petitioner-Appellee,
v.
Harry PARKER, Chief, Respondent-Appellant.
 Nos. 77-1463 to 77-1465.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 9, 1978.
Decided May 19, 1978.
 
 Brooks McLemore, Jr., Atty. Gen. of Tenn., Michael E. Terry, Asst. Atty. Gen., Nashville, Tenn., for respondent-appellant.
 Walter L. Evans, Memphis, Tenn. (court-appointed), for petitioners-appellees in Nos. 77-1463 and 77-1464.
 Alan Bryant Chambers, Memphis, Tenn., for petitioner-appellee in No. 77-1465.
 Before EDWARDS, PECK and KEITH, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 This appeal involves a sequence of events which have the flavor of the old West before the law ever crossed the Pecos. The difference is that here there are no heroes and here there was a trial.
 
 
 2
 In July of 1970 a Las Vegas gambler named William Douglas came to Memphis with dob[1] and gun and an assumed name. Using the services of a runner with the improbable name of Woppy Gaddy, who had been promised a cut of the take, Douglas was introduced to Robert Wood, a sometime Memphis gambler. In three evenings of gambling with cards marked by Douglas, Wood was relieved of $5,000. He was also filled with suspicion and plans for recoupment. A fourth encounter of a similar kind left Douglas dead on the floor from a pistol shot fired by Robert Wood, and Robert Wood in possession of some of the money he had lost. In the long denouement, it also resulted in life sentences for murder for Robert Wood, Joe Wood, his brother, and three other Memphis men who are the subjects of this appeal.
 
 
 3
 These habeas corpus petitions, filed by Randolph, Pickens and Hamilton, were heard in the United States District Court for the Western District of Tennessee and resulted in the issuance of three writs of habeas corpus requiring the state to discharge petitioners unless they are promptly retried. The writs were issued by Chief Judge Bailey Brown of the Western District who, after evidentiary hearings, found violations of the right of confrontation guaranteed by the Sixth Amendment of the United States Constitution as to all three petitioners in their joint state court felony murder trial. Judge Brown based his ruling on the holding of the United States Supreme Court in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). He also found violation of petitioner Pickens' right to counsel, as guaranteed by the Sixth Amendment under the Supreme Court's interpretation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1969).
 
 
 4
 On review of the entire record of the federal habeas hearing and the prior state trial, we find ample support for the District Judge's findings of fact, and we agree with his well-reasoned conclusions of law. We affirm.
 
 
 5
 We recite the state's theory of this case from the District Judge's summary thereof:
 
 
 6
 In July, 1970, Robert Woods had lost a considerable amount of money in head-to-head card games with one Douglas and had become convinced that Douglas had been cheating him. In anticipation of still another game, Robert asked his brother, Joe Woods, to arrange to "have the game robbed," and in this way regain most, if not all, of what he had lost. Joe Woods then enlisted petitioner Hamilton, an employee of his, who associated petitioners Randolph and Pickens,([2]) to carry out this venture. While the card game was in progress, petitioners, by pre-arrangement, were waiting in the vicinity of the apartment where it was being held. Joe Woods and one Tommy Thomas were in the apartment watching the game. Joe left the apartment and brought petitioners back with him, but failed to gain entrance for them when Douglas, hearing strange noises in the hallway, refused to allow the door to be opened. However, later, after petitioners had returned to their place of waiting, Joe did obtain admission for himself into the apartment. Shortly thereafter, Joe pulled a pistol on Douglas and Thomas, and then, handing the pistol to Robert Woods, went to tell petitioners to move in on the game. (Obviously, matters were not going according to plan.) Before petitioners reached the apartment, however, Douglas went for his pistol with the result that Robert Woods shot and killed him. Within seconds after the shooting, Joe and the petitioners knocked the apartment door down and entered, Robert then took all of the cash, and later petitioners Hamilton and Randolph (but not petitioner Pickens) were paid $50.00 for their participation.
 
 
 7
 The state's problems of proof in relation to the two Wood brothers were quite different from those applicable to the current petitioners. Witness Thomas testified explicitly to Douglas' method of cheating Robert Wood at cards and to his (Thomas') complicity in it. He also testified to Joe Wood's producing a pistol (after Robert Wood accused Douglas of cheating him) and that Joe Wood handed the gun to Robert and ran out of the room. Thomas then testified that with only himself, Douglas and Robert Wood in the room, he heard a shot and saw Douglas fall fatally wounded.
 
 
 8
 Robert Wood was the only one of the five codefendants who testified before the jury at the state court trial. Although he had originally given the police a statement which obviously sought to accuse outsiders to the poker game of killing Douglas, at the trial he admitted firing the fatal shot. His evidence sought to mitigate the shooting by testifying about his reasons for believing that Douglas was cheating him and to present a self-defense theory by claiming that Douglas reached for his own gun before he (Robert Wood) fired.
 
 
 9
 The state's problems in relation to the three present petitioners were considerably greater. None of them took the stand. Eyewitness Thomas could not identify any of them. Robert Wood, who had originally denied that he killed Douglas, admitted at trial that he had killed Douglas. He also testified that Hamilton (whom he had known as an employee of Joe Wood) was one of the three armed black men who entered the room after he (Robert Wood) had killed Douglas. He was unable to make a clear identification of petitioners Pickens and Randolph as the other two participants at the scene. The state's reliance, as a result, was primarily upon the admission of oral or written statements said by the Memphis police to have been furnished voluntarily by the three petitioners.
 
 
 10
 While each such statement was redacted to the extent of eliminating the other two petitioners' names, they were such as to leave no possible doubt in the jurors' minds concerning the "person(s)" referred to.
 
 
 11
 It should also be noted that at the original trial, motions to suppress the Randolph and Pickens statements were made on grounds of physical abuse and threats, but were denied by the state court trial judge after some rather vivid coercion complaints. The District Judge found no federal constitutional abuse in the state trial judge's finding on this score and no issue concerning coercion is presented on this appeal.
 
 
 12
 The state trial judge also gave in each instance an instruction to the jury that the confession admitted could only be used against the defendant who gave it and not as evidence of guilt of the codefendants.
 
 
 13
 As indicated above, all five of the defendants in the state court trial were found guilty of first degree murder and sentenced to life imprisonment.
 
 
 14
 After their state court trial convictions and sentences, all five defendants appealed. The Tennessee Court of Appeals set the convictions aside on the ground that the Bruton rule, Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), had been violated by the admission of confessions by coconspirators who did not testify and were not subject to cross-examination, and because under Tennessee law, felony murder had not been made out in relation to these three parties who had not entered the room at the time of the shooting. The Tennessee Supreme Court, however, reversed on both of these issues. It construed Tennessee felony murder law broadly enough to include these three petitioners because they were parties to a prior robbery plan. The court also held that each defendant's own statement "interlocked with" and corroborated the other statements of the other two defendants. In these contentions it found justification for the admission of all three confessions as to petitioners, citing Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) and Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), and some Tennessee case law (see O'Neil v. State, 2 Tenn.Cr.App. 518, 455 S.W.2d 597 (1970)).
 
 
 15
 It should be noted that no court which has dealt with these three petitioners' Bruton contentions has sought to treat the admission of the three confessions as harmless error.
 
 THE BRUTON ISSUE
 
 16
 In Bruton v. United States, supra, the United States Supreme Court set forth the rule of law which we believe governs this case. The Court's opinion said:
 
 
 17
 (A)s was recognized in Jackson v. Denno, supra (378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908), there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Compare Hopt v. Utah, supra (120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708); Throckmorton v. Holt, 180 U.S. 552, 567, 21 S.Ct. 474, 45 L.Ed. 663; Mora v. United States, 5 Cir., 190 F.2d 749; Holt v. United States, 10 Cir., 94 F.2d 90. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. Pointer v. Texas, supra (380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923) * * * It was enough that that procedure posed "substantial threats to a defendant's constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and reliably determined. These hazards we cannot ignore." 378 U.S., at 389, 84 S.Ct., at 1787, 12 L.Ed.2d 908. Here the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all. See Anderson v. United States, 318 U.S. 350, 356-357, 63 S.Ct. 599, 602, 87 L.Ed. 829; cf. Burgett v. Texas, 389 U.S. 109, 115, 88 S.Ct. 258, 262, 19 L.Ed.2d 319.
 
 
 18
 Reversed.Bruton v. United States, supra at 135-37, 88 S.Ct. at 1627 (footnotes omitted).
 
 
 19
 We find no instance where the rule just stated has been overruled or altered in subsequent Supreme Court opinions.
 
 
 20
 In the case presently before us, the Bruton rule of exclusion would therefore apply to all police evidence concerning the confessions (written or oral) said to have been given by the three present petitioners. No one of the petitioners took the stand or was available for cross-examination by his codefendants. As to each defendant, testimony concerning the two other confessions was purely hearsay and was admitted without any possibility of in-court confrontation.
 
 
 21
 We find no language in the Harrington or Schneble cases relied upon by the state which holds testimony concerning the confessions of joint defendants to be admissible under such circumstances with or without judicial admonitions to the jury.
 
 
 22
 As we read the Supreme Court opinions in Harrington and Schneble, the sole issue pertained to whether or not (assuming the codefendants' confessions had been admitted in violation of Bruton's interpretation of the confrontation clause) there were nonetheless admissible proofs of such force as to make the constitutional error "harmless beyond reasonable doubt." See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In Harrington the Court's opinion described such proofs as "so overwhelming that unless we say no violation of Bruton can constitute harmless error, we must leave this state conviction undisturbed." Harrington v. California, supra at 254, 89 S.Ct. at 1729. And the Court, in addition to noting other admissible evidence indicating guilt, noted specifically that a codefendant who testified and was cross-examined had placed Harrington in the store with a gun when the murder was committed. The clearly admissible facts in Schneble were equally clearly probative of participation in the murder there involved.
 
 
 23
 This court has sought faithfully to follow the teachings of Bruton, Harrington and Schneble. See Glinsey v. Parker, 491 F.2d 337 (6th Cir.), cert. denied, 417 U.S. 921, 94 S.Ct. 2630, 41 L.Ed.2d 227 (1974); United States v. Brown, 452 F.2d 868 (6th Cir. 1971), aff'd, 411 U.S. 223, 92 S.Ct. 2502, 33 L.Ed.2d 332 (1973); and Hodges v. Rose, 570 F.2d 643 (6th Cir. 1978). In the last two cases we found Bruton violations, but our analysis of the clearly admissible evidence showed it to be so strong as to make the Bruton error harmless beyond reasonable doubt.
 
 
 24
 We recognize that the majority opinions in both Harrington and Schneble accepted the defendant's own confession as part of the evidence to be weighed as admissible in determining whether the violation of the Bruton rule was or was not harmless error. Since all three of these confessions were inadmissible at this joint trial, we find this holding conceptually difficult in this case. Nonetheless, we accept at face value each of the defendants' confessions in this case as it might apply in a single trial against him. So considered in each case, we find such evidence, plus the testimony of Robert Wood, sufficient to support, but certainly not so overwhelming as to compel the jury verdict of guilty of first degree murder. As indicated below, there might be reasons to reach a different conclusion as to these defendants if they were contesting a jury verdict of armed robbery rather than first degree murder.
 
 
 25
 In evaluating the question of harmless error in this case, it is important to point out the factors which might affect a jury's verdict in relation to these three defendants in separate trials where the Bruton rule was observed:
 
 
 26
 1) Randolph, Pickens and Hamilton were not involved in the gambling game between Douglas, the Las Vegas gambler, and Robert Wood, the hometown gambler who got cheated.
 
 
 27
 2) They were not involved in originating the plan for recouping Robert Wood's losses.
 
 
 28
 3) They were not in the room (and had not been) when Robert Wood killed Douglas.
 
 
 29
 4) Indeed, the jury could conclude from the admissible evidence in this case that when Joe Wood pulled out his pistol, the original plan for three "unknown" blacks to rob the all-white poker game was aborted and that petitioners' subsequent entry into the room did not involve them in the crime of murder.
 
 
 30
 Additionally, if we return to consideration of the joint trial, that jury as charged by the state court judge had the responsibility of determining whether or not any of the three confessions testified to by Memphis police was voluntarily given. Assuming that two of the three confessions had been removed from jury consciousness by adherence to Bruton, we find it impossible to conclude that the jury finding and ultimate verdict would, "beyond reasonable doubt," have been the same.
 
 
 31
 These factors serve to distinguish this case from Harrington v. California, supra, and Schneble v. Florida, supra, and to convince us that the Bruton errors found by the District Judge cannot (as he also held) be determined to be harmless beyond reasonable doubt.
 
 
 32
 We are fully aware that our rejection of the "interlocking" confession theory underscores a conflict between the holding of the Sixth Circuit in Glinsey v. Parker, supra, United States v. Brown, supra, and Hodges v. Rose, supra, and the views of the Second Circuit, as exemplified by United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296, 300 (2d Cir. 1968), cert. denied, 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970); United States ex rel. Ortiz v. Fritz, 476 F.2d 37, 39-40 (2d Cir.), cert. denied, 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973); and United States ex rel. Stanbridge v. Zelker, 514 F.2d 45, 48-50 (2d Cir.), cert. denied, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975).
 
 
 33
 The Second Circuit rationale is set out in the first of these cases as follows:
 
 
 34
 Catanzaro's final claim is that the failure of the trial court to grant his motion for a separate trial prejudiced his right to a fair trial. He relies on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and United States ex rel. Hill v. Deegan, supra (268 F.Supp. 580 (S.D.N.Y. 1967)) and argues that because the confession of the codefendant McChesney was introduced at the joint trial the writ of habeas corpus should be granted here.
 
 
 35
 The reasoning of Hill and Bruton is not persuasive here. Both of those cases involved a defendant who did not confess and who was tried along with a codefendant who did. In our case Catanzaro himself confessed and his confession interlocks with and supports the confession of McChesney.
 
 
 36
 Where the jury has heard not only a codefendant's confession but the defendant's own confession no such "devastating" risk attends the lack of confrontation as was thought to be involved in Bruton. See 391 U.S. at 136, 88 S.Ct. 1620.
 
 
 37
 United States ex rel. Catanzaro v. Mancusi, supra at 300.
 
 
 38
 Catanzaro was decided on the heels of Bruton v. United States, supra. As noted above, there has been much debate on differing facts, as to whether a violation of the Bruton rule should or should not be held to be harmless error beyond reasonable doubt. But in no instance has the Supreme Court overruled Bruton or suggested that either identity or greater or lesser similarity of confessions presented by hearsay and without confrontation served to make them admissible. See Harrington v. California, supra, and Schneble v. Florida, supra. We believe that Bruton v. United States is controlling law. We also believe that there is a great difference between holding that hearsay and unconfronted confessions are admissible as to others than the confessor in joint trials, and holding that such confessions are inadmissible and, where admitted in error, must result in new trials unless the court can say that the constitutional error was harmless beyond reasonable doubt. But see Metropolis v. Turner, 437 F.2d 207, 208-09 (10th Cir. 1971) and United States v. Walton, 538 F.2d 1348, 1353-54 (8th Cir.), cert. denied, 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976).
 
 
 39
 While there are conflicting Circuit Court opinions[3] which are both supportive of and contrary to the views expressed above on the Bruton violation and harmless error issues, this court's view was stated earlier in an opinion by our then colleague Judge Wade McCree. See United States v. Brown, 452 F.2d 868 (6th Cir. 1971), aff'd, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).
 
 
 40
 What we have written upon the Bruton issue requires our affirmance of issuance of the writs of habeas corpus. We therefore feel no need to write upon the second issue concerning the District Judge's finding that Pickens' right to counsel had been violated beyond noting that we have reviewed and we affirm his findings of fact and conclusions of law on this issue also.
 
 
 41
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 A dob is a device (which Douglas wore under his collar) which contained a preparation for marking cards so that the professional dobber could read their backs, but his amateur opponent could not
 
 
 [2]
 All three petitioners in this case are black, whereas all the card players and watchers were white
 A police officer was allowed to testify, over objection, to an oral statement by Randolph that a coconspirator (presumably Joe Wood) had told Randolph "that the money was going to be taken even if he had to kill" Douglas.
 
 
 [3]
 1. Cases rejecting "interlocking" confession admissibility:
 a. Expressly:
 Hodges v. Rose, 570 F.2d 643, 647 (6th Cir. 1978); United States v. DiGilio, 538 F.2d 972, 981-83 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977).
 b. Impliedly:
 Hall v. Wolff, 539 F.2d 1146, 1148-49 (8th Cir. 1976); Glinsey v. Parker, 491 F.2d 337, 340-44 (6th Cir.), cert. denied, 417 U.S. 921, 94 S.Ct. 2630, 41 L.Ed.2d 227 (1974); United States v. Brown, 452 F.2d 868 (6th Cir. 1971), aff'd, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); Ignacio v. Guam, 413 F.2d 513, 515-16 (9th Cir. 1969), cert. denied, 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970); United States ex rel. Johnson v. Yeager, 399 F.2d 508, 510-11 (3d Cir. 1968), cert. denied, 393 U.S. 1027, 89 S.Ct. 620, 21 L.Ed.2d 570 (1969).
 
 
 [2]
 Cases adopting "interlocking" confession admissibility:
 United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296, 300 (2d Cir. 1968), cert. denied, 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970); United States ex rel. Stanbridge v. Zelker, 514 F.2d 45, 48-50 (2d Cir.), cert. denied, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); United States ex rel. Duff v. Zelker, 452 F.2d 1009, 1010 (2d Cir. 1971), cert. denied, 406 U.S. 932, 92 S.Ct. 1807, 32 L.Ed.2d 134 (1972).
 
 
 [3]
 Cases relying upon both "harmless error" and "interlocking" confession admissibility (or saying that the choice of doctrine made no difference):
 United States v. Walton, 538 F.2d 1348, 1353-54 (8th Cir.), cert. denied, 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976); Mack v. Maggio, 538 F.2d 1129, 1130 (5th Cir. 1976); United States v. Spinks, 470 F.2d 64, 65-66 (7th Cir.), cert. denied, 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972); Metropolis v. Turner, 437 F.2d 207, 208-09 (10th Cir. 1971); United States ex rel. Dukes v. Wallack, 414 F.2d 246, 247 (2d Cir. 1969).
 
 
 [4]
 In United States ex rel. Ortiz v. Fritz, 476 F.2d 37, 38-40 (2d Cir.), cert. denied, 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973), a panel of the Second Circuit questioned the "interlocking" confession doctrine but felt bound to follow it by United States ex rel. Catanzaro v. Mancusi, supra